TATA AIG GENERAL INSURANCE CO.,   )
LTD., as Subrogeee of Zydus Phramaceuticals  )
(USA), Inc.                              )
                                        )
       Plaintiff,                    )
                                        )
v.                                    )     No. 3:12-cv-00067
                                    )     Chief Judge Haynes
                                        )
BRITISH AIRWAYS PLC CORP.         )
a/k/a BRITISH AIRWAYS WORLD CARGO, )
a foreign corporation, and FAF, INC.,    )
a Tennessee corporation              )
                                        )
       Defendant.                  )

# MEMORANDUM

Plaintiff, Tata AIG General Insurance Co., Ltd. ("AIG') filed this action under 28 U.S.C. §§ 1331 and 1332, the federal question and diversity jurisdiction statutes against the Defendants: British Airways PLC Corporation, also known as British Airways World Cargo and FAF, Inc., a Tennessee corporation. AIG is the subrogee for Zydus Pharmaceuticals, Inc. on claims arising from Zydus's purchase of pharmaceuticals that Defendant British Airways contracted to transport to Memphis, Tennessee from Mumbai, India. Upon inspection of the pharmaceuticals in Memphis, Zydus rejected the drugs due to water damage and the drugs were subsequently destroyed. Zydus filed a loss claim with AIG, its insurer and upon payment, AIG became the subrogee of Zydus's claims in this action. Plaintiff's claims are, in sum: (1) that Defendant British Airways failed to deliver the pharmaceuticals in good order and condition, as required under the terms of the Air Waybill; (2) that Defendant British Airways was negligent in transporting the pharmaceuticals by a truck that was

submerged in flood waters in Nashville, Tennessee; (3) that Defendant FAF failed to deliver the pharmaceuticals in good order and condition, as required by the Air Waybill; and (4) that Defendant FAF wrongfully ordered its truck driver to stop overnight in Nashville despite weather forecasts of flooding in the Nashville area.

Before the Court are British Airways's motion for summary judgment (Docket Entry No. 46) and FAF's motion for partial summary judgment (Docket Entry No. 51). AIG has filed responses in opposition to these motions (Docket Entry Nos. 53 and 54), to which FAF filed a reply. (Docket Entry No. 57).

In their motions, British Airways and FAF contend, in essence: (1) that the Montreal Convention[1] governs the parties' rights and liabilities because the cargo transportation was between two signatory nations, India and the United States; (2) alternatively, that the Montreal Convention preempts AIG's state law claims; (3) that AIG's state law claims are limited by Tennessee's economic loss doctrine that restricts AIG to its contractual remedies; and (4) that under the Montreal Convention or the parties' transportation contract, AIG's damages are limited to the contract's provision for 19 Special Drawing Rights ("SDR") per kilogram of chargeable weight of the cargo, approximately $126,060. (Docket Entry Nos. 46 and 52).

In response, Plaintiff contends, in sum: (1) that Article 18(4) of the Montreal Convention expressly excludes transportation outside of an airport and any presumption that any cargo damage occurred during air carriage transport is subject to rebuttal, as here; (2) that British Airways did not provide reasonable notice of any "limitation of liability" and the cited provisions of the

---

[1]As discussed <u>infra</u>, the Montreal Convention is an international treaty for air carriers' liability adopted in 1999 and effective in 2003 that superceded the Warsaw Convention and "is an entirely new treaty." <u>Ehrlich v. American Airlines, Inc.</u>, 360 F.3d 366, 371 n.4 (2nd Cir. 2004).

transportation contract are internally inconsistent; (3) that the decisions relied upon by British Airways are distinguishable on their facts; (4) that FAF's reliance on the transport contract to which FAF is neither a party nor beneficiary, is misplaced as that agreement expired on June 30, 2007; and (5) that Defendants lack any precedent that the economic loss doctrine applies a person's tort claim against a common carrier for damaged cargo that tort law recognizes.

In its reply, British Airways reiterates its prior arguments and adds that AIG relies upon decisions interpreting the Warsaw Convention and the Montreal Convention's provisions differ from that the Warsaw Convention. In its reply, FAF contends that AIG's exclusive reliance upon the second sentence of Article 18(4), erroneously interprets the Montreal Convention. (Docket Entry No. 57 at 2).

In its surreply, AIG asserts that the Defendants raise new arguments in their replies. (Docket Entry No. 62). Specifically, Plaintiff cites the Defendants' suggestion that "the use of the truck was 'without the consent of the consignor,'"that "is in direct conflict with the Defendants' previous arguments and the facts. Id. at 4.

For the reasons set forth below, the Court concludes that because FAF was not disclosed in the British Airways Air Waybill for the transport of these goods the Montreal Convention does not apply. AIG's claims are contract claims for which the amount of damages in the event of a breach, was agreed upon by the parties. Tennessee law is the controlling law on AIG's claims and Tennessee law does not permit AIG to convert its breach of contract claims to tort claims. This conclusion renders consideration of the parties' contentions about preemption and the economic loss doctrine moot.

## A. Review of the Record[2]

### 1. Zydus's Purchase of Pharmaceuticals

Sometime prior to April 24, 2010, Zydus purchased pharmaceuticals from Cadila Health Care to resell to DDN Pharmaceuticals in Memphis, Tennessee. (Docket Entry No. 55-3 at ¶ 1). On April 24, 2010, Cadila Health Care contracted with Freightwings and Travel Pvt., Ltd. to coordinate the shipment of these pharmaceuticals to Memphis from Mumbai, India. Id. at ¶ 2. Subsequently, Freightwings and Travel Pvt, Ltd. contracted with British Airways to transport the pharmaceuticals to Tennessee from India. Id. at ¶ 3. This Air Waybill was "issued by British Airways". The Air Waybill for the shipment described the shipping route as from London, England to Philadelphia, Pennsylvania to Memphis. FAF is not listed on the airbill. Defendants note that Cadila Health did not list a value for its shipment nor elect to insure its shipment for increased coverage in the event of a loss.

On April 24, 2010, British Airways transported these pharmaceuticals to London from Mumbai, India and then to Philadelphia from London.(Docket Entry No. 49, Dominguez Affidavit at ¶ 4). AIG asserts that on April 29, 2010, British Airways subcontracted with FAF to transport these pharmaceuticals to Memphis from Philadelphia by ground transportation. (Docket Entry No.

---

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court concludes that under the applicable law, there are not any material factual disputes. Thus, this section constitutes findings of fact.

1 at ¶ 12). On the night of May 2, 2010, FAF's driver was traveling on Interstate 40 in the Nashville area westbound to Memphis when the Interstate was closed due to flooded roads. (Docket Entry No. 48-4, Accident Report). FAF's truck driver exited the Interstate at exit 196 and parked in the Shoney's/Regal Cinema parking lot and commenced his ten-hour break. Id. The next morning, the truck driver awakened to discover that the parking lot was flooded. Id. Over the next several hours, the flood waters continued to rise and the truck's driver evacuated the driver compartment and waited on the truck's roof until he was rescued. Id. As a result of the flood waters, the truck, its trailer and contents, Zydus's pharmaceuticals, were submerged in water. Id.

FAF asserts that in July 2004, British Airways and Forward Air, Inc. executed a Surface Transportation Contract ("STC") to govern their relationship. (Docket Entry No. 51-2, at 5). Under this latter agreement, British Airways and FAF agreed that the Montreal Convention would govern cargo received from British Airways and that FAF's liability for damages would not exceed 19 SDRs per kilogram.

### 2. Conditions of Contract on Air Waybill

The Air Waybill for the transportation of Zydus's pharmaceuticals is undated, but contains "conditions of contract" on the back page of this bill. According to the parties, the pertinent provisions of this Airway Bill are as follows:

1.        In this contract and the Notices Appearing herein:
CARRIER includes the air carrier issuing thie air waybill and all carriers that carry of undertake to carry the cargo or perform any other sevices related to such carriage.
SPECIAL DRAWING RIGHT (SDR) is a Special Drawing Right as defind by the International Monetary Fund.
WARSAW CONVENTION means whichever of the following instruments is applicable to the contract at carriage:
the Convention for the Unification of Certain Rules Relating to

International Carriage by Air, sight at Warsaw, 12 October 1929; that Convention as amended at The Hague on 28 September 1955; that Convention as amended at The Hague 1955 and by Montreal Protocol No. 1, 2, or 4 (1975) as the case may be.

MONTREAL CONVENTION means the Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on 28 May 1999.

2.    2.1    Carriage is subject to the rules relating to liability established by the Warsaw Convention or the Montreal Convention unless such carriage is not "international carriage" as defined by applicable conventions.

\* \* \*

4.          For carriage to which the Montreal Convention does not apply, Carrier's liability limitation for cargo lost, damaged or delayed shall be 19 SDRs per kilogram unless a greater per kilogram monetary limit is provided in any applicable Convention or in Carrier's tariffs or general conditions of carriage.

\* \* \*

6.    6.1    For cargo accepted for carriage, the Warsaw Convention and the Montreal Convention permit shipper to increase the limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

       6.2    In carriage to which neither the Warsaw Convention nor the Montreal Convention applies Carrier shall, in accordance with the procedures set forth in its general conditions of carriage and applicable tariffs, permit shipper to increase the limitation of liability by declaring a higher value for carriage and paying a supplemental charge if so required.

(Docket Entry No. 49-1 at 2). Another pertinent provision is paragraph 9 that reads as follows:

9.          Carrier undertakes to complete the carriage with reasonable dispatch. **Where permitted by applicable laws, tariffs and government regulations, Carrier may use alternate carriers, aircraft or modes of transport without notice but with due regard to the interests of the shippe. Carrier is authorized by the shipper to select the routing and the intermediate** stopping **places that it deems**

> **appropriate or to change or deviate from the routing shown on the face hereof.**

Id. (emphasis added).

## 2. British Airway's Website

British Airways cites its website that also contains "Conditions of Contract" for its services, and effective December 30, 2009 the conditions published on its website were as follows:

AIR WAYBILL - IATA CONDITIONS OF CONTRACT

The following Conditions of Contract and Notices are included on an Air Waybill.
1. Notice appearing on the face of the Air Waybill

It is agreed that the goods described herein are accepted in apparent good order and condition (except as noted) for carriage SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF. ALL GOODS MAY BE CARRIED BY ANY OTHER MEANS INCLUDING ROAD OR ANY OTHER CARRIER UNLESS SPECIFIC CONTRARY INSTRUCTIONS ARE GIVEN HEREON BY THE SHIPPER, AND SHIPPER AGREES THAT THE SHIPMENT MAY BE CARRIED VIA INTERMEDIATE STOPPING PLACES WHICH THE CARRIER DEEMS APPROPRIATE. THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY. Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

II. Conditions of Contract on reverse side of the Air Waybill

Notice concerning carriers limitation of liability

If the carriage involves an ultimate destination or stop in a country other than the country of departure, the Warsaw Convention or the Montreal Convention may be applicable and in most cases limit the liability of the Carrier in respect of loss of, damage or delay to cargo. Depending on the applicable regime, and unless a higher value is declared, liability of the Carrier may be limited to 19 Special Drawing Rights per kilogram under the Montreal Convention; 17 Special Drawing Rights per kilogram under the Warsaw Convention as amended by Montreal Protocol No. 4; or 250 French gold francs per kilogram under the Warsaw Convention (unamended by Montreal Protocol No. 4), converted into national currency under applicable law, unless a greater amount is specified in the Carrier's conditions of carriage.

1. In this contract and the Notices appearing hereon:

**CARRIER includes the air carrier issuing this air waybill and all carriers that carry or undertake to carry the cargo or perform any other services related to such carriage.**

SPECIAL DRAWING RIGHT (SDR) is a Special Drawing Right as defined by the International Monetary Fund.

WARSAW CONVENTION means whichever of the following instruments is applicable to the contract of carriage:
the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw, 12 October 1929;
that Convention as amended at The Hague on 28 September 1955;
that Convention as amended at The Hague 1955 and by Montreal Protocol No. 1, 2, or 4 (1975) as the case may be.;

MONTREAL CONVENTION means the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal on 28 May 1999.;

2./2.1  Carriage is subject to the rules relating to liability established by the Warsaw Convention or the Montreal Convention unless such carriage is not "international carriage" as defined by the applicable Conventions.

2.2 To the extent not in conflict with the foregoing, carriage and other related services performed by each Carrier are subject to:

2.2.1 applicable laws and government regulations;

2.2.2 provisions contained in the air waybill, Carrier's conditions of carriage and related rules, regulations, and timetables (but not the times of departure and arrival stated therein) and applicable tariffs of such Carrier, which are made part hereof, and which may be inspected at any airports or other cargo sales offices from which it operates regular services. **When carriage is to/from the USA, the shipper and the consignee are entitled, upon request, to receive a free copy of the Carrier's conditions of carriage. The Carrier's conditions of carriage include, but are not limited to:**

2.2.2.1 **limits on the Carrier's liability for loss, damage or delay of goods, including fragile or perishable goods;**

\* \* \*

2.2.2.5 **Rights of the Carrier and limitations concerning delay or failure to perform service, including schedule changes, substitution of alternate Carrier or aircraft and rerouting.**

3. **The agreed stopping places (which may be altered by Carrier in case of necessity) are those places, except the place of departure and place of destination, set forth on the face hereof or shown in Carrier's timetables as scheduled stopping places for the route. Carriage to be performed hereunder by several successive Carriers is regarded as a single operation.**

4. For carriage to which the Montreal Convention does not apply, Carrier's liability limitation shall not be less than the per kilogram monetary limit set out in any applicable Convention or in Carrier's tariffs or general conditions of carriage for cargo lost, damaged or delayed, provided that any such limitation of liability in an amount less than 19 SDRs per kilogram will not apply for carriage to or from the United States.

\* \* \*

6./6.1 For cargo accepted for carriage, the Warsaw Convention and the Montreal Convention permit shipper to increase the limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

6.2 In carriage to which neither the Warsaw Convention nor the Montreal Convention applies Carrier shall, in accordance with the procedures set forth in its general conditions of carriage and applicable tariffs, permit shipper to increase the limitation of liability by declaring a higher value for carriage and paying a supplemental charge if so required.

7./7.1 In cases of loss of, damage or delay to part of the cargo, the weight to be taken into account in determining Carrier's limit of liability shall be only the weight of the package or packages concerned.

7.2 Notwithstanding any other provisions, for "foreign air transportation" as defined by the U.S. Transportation Code:

7.2.1 in the case of loss of, damage or delay to a shipment, the weight to be used in determining Carrier's limit of liability shall be the weight which is used to determine the charge for carriage of such shipment; and

7.2.2 in the case of loss of, damage or delay to a part of a shipment, the shipment weight in 7.2.1 shall be prorated to the packages covered by the same air waybill whose value is affected by the loss, damage or delay. The weight applicable in the

9

case of loss or damage to one or more articles in a package shall be the weight of the entire package.

8. **Any exclusion or limitation of liability applicable to Carrier shall apply to Carrier's agents, employees, and representatives and to any person whose aircraft or equipment is used by Carrier for carriage and such person's agents, employees and representatives.**

9. Carrier undertakes to complete the carriage with reasonable dispatch. **Where permitted by applicable laws, tariffs and government regulations, Carrier may use alternative carriers, aircraft or modes of transport without notice but with due regard to the interests of the shipper. Carrier is authorised by the shipper to select the routing and all intermediate stopping places that it deems appropriate or to change or deviate from the routing shown on the face hereof.**

10. Receipt by the person entitled to delivery of the cargo without complaint shall be prima facie evidence that the cargo has been delivered in good condition and in accordance with the contract of carriage.

Docket Entry No. 49-2) (citing British Airways World Cargo, "Air Waybill - IATA Conditions of Contract," <www.baworldcargo.com/legal/conditions_of_contract.shtml> (last visited April 29, 2013)) (emphasis added).

The set of "Conditions of Contract" on the back page of the actual billing contract, (Docket Entry No. 49-1), differ from British Airways' website version. (Docket Entry No. 49-2 at 250-52). Section 1 on the back page of the billing contract defines "CARRIER", "SPECIAL DRAWING RIGHT", "WARSAW CONVENTION", and "MONTREAL CONVENTION", while the website's "Conditions of Contract" define the above terms in Section 2. Moreover, Section 1 of Conditions of Contract on British Airways's website provides,

It is agreed that the goods described herein are accepted in apparent good order and condition (except as noted) for carriage SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERES HEREOF, ALL GOODS MAY BE CARRIED BY ANY OTHER MEANS INCLUDING ROAD OR ANY OTHER CARRIER UNLESS SPECIFIC CONTRARY INSTRUCTIONS ARE GIVEN HEREON BY THE SHIPPER, AND SHIPPER AGREES THAT THE SHIPMENT MAY BE

> CARRIED VIA INTERMEDIATE STOPPING PLACES WHICH THE CARRIER
> DEEMS APPROPRIATE. THE SHIPPER'S ATTENTION IS DRAWN TO THE
> NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY. Shipper
> may increase such limitation of liability by declaring a higher value for carriage and
> paying a supplemental charge if required.

Docket Entry No. 49-2. (alterations in original). The "Conditions of Contract" on the back page

of the actual billing contract does not contain the above language. In addition, Section 2 of British

Airways's Conditions of Contract provides:

> Depending on the applicable regime, and unless a higher value is declared, liability
> of the Carrier may be limited to 19 Special Drawing Rights per kilogram under the
> Montreal Convention; 17 Special Drawing Rights per kilogram under the Warsaw
> Convention as amended by Montreal Protocol No. 4; or 250 French gold francs per
> kilogram under the Warsaw convention (unamended by Montreal Protocol No. 4),
> converted into national currency under applicable law, unless a greater amount is
> specified in the Carrier's conditions of carriage.

Id. The above language is not found in Section 2 of the Conditions of Contract on the back of the

actual billing contract.

### 3. The Montreal Convention

Article 18 of the Montreal Convention governing "Damage to Cargo" recognizes that air

carriage transport may involve some ground transportation and provides, in pertinent part:

> 1. The carrier is liable for damaged sustained in the event of the destruction or
> loss of or damage to, cargo upon condition only that the event which caused the
> damage so sustained took place during the carriage by air.
>
> * * *
>
> 3. **The carriage by air within the meaning of paragraph 1 of this Article
> comprises the period during which the cargo is in charge of the carrier.**
>
> 4. The period of the carriage by air does not extend to any carriage by land, by sea or
> by inland waterway performed outside an airport. **If, however, such carriage takes
> place in the performance of a contract for carriage by air, for the purpose of
> loading, delivery or transhipment, any damage is presumed, subject to proof to**

**the contrary, to have been the result of an event which took place during the carriage by air. If a carrier, without the consent of the consignor, substitutes carriage by another mode of transport for the whole or part of a carriage by another mode of transport for the whole or part of the carriage intended by the agreement between the parties to be carriage by air, such carriage by another mode of transport is deemed to be within the period of carriage by air.**

(Docket Entry No. 48-1 at 8-9, Montreal Convention, Art. 18(1) (2) and (4)) (emphasis added).

Among the other provisions of the Montreal Convention cited by the parties are the following:

1(1):  This Convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward. It applies equally to gratuitous carriage by aircraft performed by an air transport undertaking.

1(2):  For the purposes of this Convention, the expression "international carriage" means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transhipment, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party. Carriage between two points within the territory of a single State Party without an agreed stopping place within the territory of another State is not international carriage for the purposes of this Convention.

\* \* \*

22.  In the carriage of baggage, the liability of the carrier in the case of destruction, loss, damage, or delay is limited to 1,000 Special Drawing Rights for each passenger unless the passenger has made, at the time when the checked baggage was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplemental sum if the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless it proves that the sum is greater than the passenger's actual interest in delivery at destination.

**In the carrier of cargo, the liability of the carrier in the case of destruction, loss, damage, or delay is limited to a sum of 17 Special Drawing Rights per kilogram, unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplemental sum if**

12

the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless it proves that the sum is greater than the passenger's actual interest in delivery at destination.

In the case of destruction, loss, damage, or delay of part of the cargo, or of any object contained therein, the weight to be taken into consideration in determining the amount to which the carrier's liability is limited shall be only the total weight of the package or packages concerned. Nevertheless, when destruction, loss, damage, or delay of a part of a cargo, or of an object contained therein, affects the value of other packages covered by the same air waybill, or the same receipt of, if they were not issued, by the same record preserved by other means referred to in paragraph 2 of Article 4, the total weight of such package or packages shall also be taken into consideration in determining the limit of liability.

* * *

The limits prescribed in Article 21 and in this Article shall not prevent the court from awarding, in accordance with its own law, in addition, the whole or part of the court costs and of the expenses of the litigation incurred by the plaintiff, including interest. The foregoing provision shall not apply if the amount of the damages was awarded, exceeding court costs and other expenses of the litigation, does not exceed the sum which the carrier has offered in writing to the plaintiff within a period of six months from the date of the occurrence causing the damage, or before the commencement of the action, if that is later.

29:     In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights. In any such action, punitive, exemplary or any other non-compensatory damages shall not be recoverable.

Id. at 8, 9, 10, 11 and 13 (emphasis added).

## B. Conclusions of Law

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56.[3] "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment <u>sua sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986); <u>accord Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an

---

[3] The Court raised, <u>sua sponte</u>, concerns that Article 33 of the Montreal Convention may deprive the Court of subject matter jurisdiction in this action. Article 33 reads, in pertinent part,

> An action for damages must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the court of the domicile of the carrier or of its principal place of business, or where it has a place of business through which the contract has been made **or before the court at the place of destination.**

<u>Id.</u> (emphasis added). The Court raised jurisdictional concerns based upon the emboldened language, but the parties cite authority advancing a liberal interpretation of Article 33 that interprets the "place of destination" to refer to nation in which the action may be brought, but not to a particular court. See <u>Pardonnet v. The Flying Tiger Line, Inc.</u>, 233 F.Supp. 683, 686 (N.D. Ill. 1964) (using Article 28(1) of Warsaw Convention's nearly identical provision to discuss the forums at issue in Article 33: "The view that Article 28(1) speaks only on the national plane has nevertheless become the predominant view in the case law and in the commentaries."). Given the arguable jurisdictional basis, the Court considers the merits of the parties' contentions.

otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

Id. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989); see also Routman, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Celotex Court:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Sixth Circuit explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v.

Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex, 477 U.S. at 322 and Rule 56(e)).

Once the moving party meets its initial burden, the Sixth Circuit warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion. . . . [and] must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty Lobby, 477 U.S. at 251, 255). Moreover, the Sixth Circuit explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (citations omitted); see also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790 (6th Cir. 1990) (quoting Liberty Lobby, 477 U.S. at 151-52) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.").

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.</u>

\* \* \*

16

Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citations omitted and emphasis added).

It is likewise true that

[I]n ruling on motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Sixth Circuit stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) (citation omitted).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of."

17

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (citation omitted). In this district, the parties must provide specific references to the proof upon which they rely. See Local Rule 56.01(c) (requiring each party to provide a statement of undisputed facts to which the opposing party must respond).

In Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989), the Sixth Circuit discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.  Complex cases are not necessarily inappropriate for summary judgment.

2.  Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.  The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.  A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.  As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.  The substantive law governing the case will determine what issues of fact are

material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.

Id. at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) whether the moving party "clearly and convincingly" established the absence of material facts; (2) if so, whether the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law?

The threshold question is whether the Montreal Convention applies to this controversy. The Montreal Convention, chartered as the Convention for the Unification of Certain Rules for International Carriage by Air, was signed on May 28, 1999 and superceded the Warsaw Convention. Danner v. Int'l Freight Sys. of Wash., LLC, 2010 WL 3294678 *3 (D. Md. Aug. 20,2010). The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed

19

by aircraft for reward." (Docket Entry No. 48-1 at 1, Montreal Convention, Art. 1(1).The Montreal Convention is aimed primarily at "unify[ing] the disjointed 'hodgepodge' of provisions in the Warsaw Convention," but "the Montreal Convention shows 'increased concern for the rights of passengers and shippers' and is less favorable to airlines in general." Id. (citations omitted). Given the "relatively little case law interpreting the Montreal Convention," the Courts consider decisions involving comparable terms of the Warsaw Convention. Id. at *10. If applicable, the Montreal Convention "provide[s] the exclusive basis for recovery." Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 456 -457 (2d. Cir. 2003).

Here, it is undisputed that the loss occurred outside of the destination airport, Memphis, Tennessee, and during land transport. Defendants contend that the land transportation is within the Montreal Convention's Article 18(2)'s definition of "carriage by air". For treaties, the judicial standard for interpretation is that courts must begin "with the literal language of the provision. We would end there if that language [is] reasonably susceptible of only one interpretation." Victoria Sales Corp. v. Emery Air Freight, Inc., 917 F.2d 705, 707 (2d. Cir. 1990) (quoting Buonocore v. Trans World Airlines, Inc., 900 F.2d 8, 9-10 (2d Cir.1990)). "[W]hen the text of a treaty is clear, a court shall not, through interpretation, alter or amend the treaty." Victoria Sales Corp., 917 F.2d at 707 (quoting Chan v. Korean Air Lines, Ltd., 490 U.S. 122 (1989)). In Victoria Sales, the Second Circuit interpreted the land provisions and the meaning of "carriage by air" in Article 18 of the Warsaw Convention,[4] where the cargo was transported to an independent contractor's storage

---

[4] The Second Circuit quoted the relevant provisions of the Warsaw Convention version of Article 18:

Section 1 of Article 18 of the Warsaw Convention provides that liability under the

facility within one quarter mile of the airport and was later lost. The Second Circuit held that Article 18, the Warsaw Convention did not apply in that factual setting and reasoned as follows:

> The plain language of Article 18 draws the line at the airport's border. The Convention's coverage excludes any transportation by land outside of the airport. Although Article 18 creates a presumption that any damage or loss occurring during the performance of a contract for air transportation was the result of an event during transportation by air, that is, on board an aircraft or within an airport, the presumption may be rebutted by evidence demonstrating that the loss occurred on land outside the airport.
>
> **Our interpretation of Article 18 . . . does not limit the meaning of "transportation by air" to "actual" air transportation. Rather, as the plain language of Article 18 directs, "transportation by air" would include a loss occurring while the cargo was in the air or on the ground but within the confines of the airport's boundaries.**

917 F.2d at 707 (emphasis added).

A dissenting opinion concluded that Article 18 in the Warsaw Convention could be applied to damages that occurred during ground transport outside the airport's geographic limits so long as the cargo was in the constructive or actual possession of the covered air carrier:

> Admittedly, Article 18 is not a good example of superior legislative draftsmanship. However, **one thing is clear, and that is that the term "transportation by air" is**

_____

Convention extends to any damage to baggage or goods sustained during "transportation by air." This phrase is defined in section 2 of Article 18 as "the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft." However, **section 3 of the same article provides, in pertinent part:**

> **The period of the transportation by air shall not extend to any transportation by land ... performed outside an airport. If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air.**

917 F.2d at 706-07.

not synonymous with "actual" air transportation.could apply to ground transport . . . In my opinion, the presumption that the loss resulted from an event occurring during the transportation by air means only that the loss is presumed to have occurred while the goods were in the charge of a carrier that was acting "in the performance of a contract for transportation by air." The pertinent second sentence of Article 18(3) reads: "If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air." A careful parsing of this sentence supports the conclusion above expressed. The sentence begins by referring to [off airport] transportation that "takes place in the performance of a contract for transportation by air"; it concludes by saying that any damage is presumed to have occurred "during the transportation by air" (emphasis supplied). The principles of statutory construction discussed in the preceding paragraph are clearly applicable; the phrase "transportation by air" has the same meaning at the end of the sentence as it had at the beginning. To further emphasize the identity of meaning, the second time the phrase is used it is preceded by the function word "the", which obviously refers to the prior use of the same phrase. See Webster's Third New International Dictionary at 2368. I believe that District Judge Shadur of the Northern District of Illinois correctly interpreted Article 18(3) when he said, "So long as the goods remain in the air carrier's actual or constructive possession pursuant to the terms of the carriage contract, the period of 'transportation by air' does not end."

Proof that the carrier has entrusted the delivery of goods to a trucker or other independent agency may be sufficient to terminate the "transportation by air."

Id. at 709, 710 (citations and footnote omitted with emphasis added). The majority rejected that view: "Under the dissenter's view, even if there is undisputed evidence, as here, that the loss occurred outside of the airport during transportation by land, the Convention governs as long as the land transportation was part of the carriage contract. This interpretation would effectively render nugatory Article 18' s command that "[t]he period of the transportation by air shall not extend to any transportation by land . . . performed outside an airport." This cannot be the result intended by the Convention's drafters." Id at 707.

Citing the presumption in Article 18 of the Montreal Convention, another court considered

the parties' underlying contract in deciding liability under that Convention. The "air way bill functions as an agreement or contract between parties, and the length of the presumptive 'carriage by air' typically depends on the language in the air waybill." Danner, 2010 WL 3294678, at * 4. "When an air waybill provides for door-to-door delivery from a foreign country to a recipient's premises in the United States, the period of carriage by air generally lasts until the recipient receives the goods. In those instances, the waybill contains provisions for the entire contract of carriage, which generally includes both air and land transportation." Id. As such, "'[s]o long as the goods remain in the air carrier's actual or constructive possession pursuant to the terms of the carriage contract, the period of 'transportation by air' does not end." Id. (quoting Jaycees Patou, Inc. v. Pier Air Int'l, Ltd., 714 F. Supp. 81, 84 (S.D.N.Y. 1989)). If, however, the air way bill does not contain any provisions regarding land transportation and provides only for transportation from one airport to another, then the period of air carriage "generally ends before delivery to the recipient is effectuated" and "proof that the carriage 'has entrusted the delivery of goods to a trucker or other independent agency may be sufficient' to end the period of carriage by air, **especially if that agency was not party to the original carriage contract.**" Id. at *5 (quoting Victoria Sales Corp., 917 F.2d at 710 and citing R.R. Salvage of Conn. V. Japan Freight Consolidators, 556 F.Supp. 124 (E.D.N.Y.1983), aff'd 779 F.2d 38 (2d Cir. 1985) (holding that the loss of cargo, which occurred after the goods were released from a freight forwarder to a trucking company, did not occur during "transportation by air.") (emphasis added)).

This Court deems the dissent in Victoria Sales and the district court's decision in Danner to be the more persuasive opinions on the appropriate interpretation of Article 18 of the Montreal Convention. Those opinions are consistent with the plain language of the Article 18 giving

appropriate consideration to its subsections. As those opinions state where, as here, the "proof [is] that the carriage 'has entrusted the delivery of goods to a trucker or other independent agency may be sufficient' to end the period of carriage by air, especially if that agency was not party to the original carriage contract." Danner, 2010 U.S. Dist. Lexis 86024, at *15 (quoting Victoria Sales, 917 F.2d at 710)). As to whether Paragraph 9 in British Airways's Air Waybill fits within the Montreal Convention Articles 18(3) and 18(4), the Court concludes that British Airways's failure, as the air carrier, to identify the independent contractor that would provide the ground transportation service precludes the application of the Montreal Convention to this controversy. Here, FAF was not party to the Air Waybill and neither British Airways nor FAF can rely on the Montreal Convention. Accordingly, given that the loss irrefutably occurred during land transportation while in the possession of a nonparty to the airway bill, the Court concludes that the Montreal Convention does not apply to this action. This conclusion renders moot consideration of the Defendants' preemption contentions.

## 2. Damages

British Airways contends that AIG's damages are limited to 19 SDRs under the applicable air waybill and conditions of contract. (Docket Entry No. 52 at 12). British Airways asserts that "pursuant to paragraph 4 of the air waybill: '[f]or carriage to which the Montreal Convention does not apply, Carrier's liability limitation for cargo lost, damaged or delayed shall be 19 SDRs per kilogram unless a greater per kilogram monetary limit is provided in any applicable Convention or in Carrier's tariffs or general conditions of carriage.'" Id. at 13. British Airways also asserts that in its Conditions of Contract it states that: "All goods may be carried by any other means including road or any other carrier unless specific contrary instructions are given hereon by the shipper . . . The

shippers' attention is drawn to the notice concerning carrier's limitation of liability. Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required." Accordingly, British Airways contends that the shipper is on notice that they may increase the liability limitation by paying a supplemental charge.

Without the Montreal Convention, the issue of damages is covered by British Airways' Air Waybill that provides in relevant part,

> For carriage to which the Montreal Convention does not apply, Carrier's liability limitation for cargo lost, damaged or delayed shall be 19 SDRs per kilogram unless a greater per kilogram monetary limit is provided in any applicable Convention or in Carrier's tariffs or general conditions of carriage.

(Docket Entry No. 49-1 at 2, Air Waybill Section 4).

FAF contends that its contract with British Airways limits FAF's liability, citing <u>Werner Enterprises, Inc. v. Westwind Maritime Int'l, Inc.</u>, 2009 U.S. App. Lexis 396 as an example of transportation intermediaries limiting their liability. (Docket Entry No. 51-1 at 4). Further, FAF asserts that it is well settled that a property broker such as Forward Air may limit their liability and that of their subcontracted carriers for cargo loss, damage and delay by contract with the upstream intermediaries and through surface providers. (Docket Entry No. 51-1 at 6-7) (citing <u>AIG Uruguay Compania De Seguros, S.A. v. Landair Transport</u>, 902 So.2d 169 (Fla. App. 2005)).

AIG contends that its claims are tort claims that are not limited by British Airways's Air Waybill.

AIG invoked this Court's diversity jurisdiction for its state law claims against British Airways and FAF. Under the diversity jurisdiction statute, state law governs the parties' claims and

defense.[5] <u>Tompkins v.Erie R. R. Co.</u>, 304 U. S. 64 (1938). Here, all parties rely upon Tennessee law as the governing law. Tennessee law has "never recognized a tort of 'negligent breach of contract'" <u>Hannan v. Alltel Publ'g Co.</u>, 270 S.W.3d 1, 10 n. 11 (Tenn. 2008). "Since a tort is defined as a civil wrong independent of contract, it may be accurately stated that all civil wrongs are either contractual or tortious. . . . Any ground which a plaintiff might state for recovery of civil damages must fall into one of the categories, contract or tort." <u>Burris v. Hospital Corp. of America</u>, 773 S.W.2d 932, 935 (Tenn. Ct. App. 1989). Tennessee courts have not deemed "liable in tort" to include breach of contract claims where a defendant may be "potentially liable in tort." <u>First Am. Title Ins. Co. v. Cumberland County Bank,</u> 633 F.Supp.2d 566, 576 (M.D. Tenn. 2009).

"The gravamen of an action is in contract and not in tort '[w]hen an act complained of is a breach of specific terms of the contract, without any reference to the legal duties imposed by law upon the relationship created thereby.'" <u>Mize v. Consulo</u>, 2011 WL 6152980, at *3 (Tenn. Ct. App. Dec. 8, 2011). In <u>Mize</u>, purchasers of a house sued sellers for breach of contract because, contrary to the sale agreement, the house was not connected to the sewer. <u>Id.</u> at *1. Like <u>Mize</u>, Plaintiff "sought damages for Sellers' failure to proved a piece of property connected to the city sewer as stated in the contract. This is not a claim for damages resulting from negligent performance but for failure to perform in accordance with the contract terms." <u>Id.</u> at *3.

Here, the relevant document is British Airways's Air Waybill that courts characterize as a

---

[5] AIG cites federal law on the appropriate characterization of its claims, citing <u>inter alia</u>, <u>The John G. Stevens</u>, 170 U.S. 113 (1898) for the proposition that a claim for damage to cargo could sound in tort, irrespective of whether a contract governing the carriage of those goods existed where the claim was by a tow against her tug for damages resulting from negligent towing gave rise to a tort claim. Yet under <u>Erie</u>, Tennessee law controls on the appropriate characterization of AIG's claims that are pled as state law claims.

transportation contract between the parties and constitutes the entire contract of carriage between the parties. Jaycees Patou, Inc. v. Pier Air Int'l, Ltd., 714 F. Supp. 81, 84 (S. D. N. Y. 1989); Magnus Electronics, Inc. v. Royal Bank of Canada, 611 F. Supp. 436, 440 (N.D. Ill. 1985). Because the Air Waybill provided Plaintiff with stated notice of the liability limitation and the opportunity of paying a supplementary charge for a greater value in the event of loss, the Court concludes that AIG is bound by the terms of British Airways's Air Waybill as Zydus's subrogee, including the Air Waybill's damages limitation. Reed-Rite Corp. v. Burlington Air Express, Ltd., 186 F.3d 1190, 1198 (9th Cir. 1999).

The Court concludes that Defendant British Airway's motion for summary judgment (Docket Entry No. 46) and Defendant FAF's motion for partial summary judgment (Docket Entry No. 51) should be granted in part on the limit of damages issue and denied as to the applicability of the Montreal Convention.

An appropriate Order is filed herewith.

**ENTERED** this the _18_ day of June, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court

TATA AIG GENERAL INSURANCE CO.,       )
LTD., as Subrogeee of Zydus Phramaceuticals   )
(USA), Inc.                           )
                                      )
         Plaintiff,                   )
                                      )
v.                                    )          No. 3:12-cv-00067
                                      )          Chief Judge Haynes
                                      )
BRITISH AIRWAYS PLC CORP.             )
a/k/a BRITISH AIRWAYS WORLD CARGO,    )
a foreign corporation, and FAF, INC., )
a Tennessee corporation               )
                                      )
         Defendant.                   )

## O R D E R

In accordance with the Memorandum filed herewith, the Defendant British Airway's motion

for summary judgment (Docket Entry No. 46) and the Defendant FAF Inc.'s motion for partial

summary judgment (Docket Entry No. 51) are **GRANTED** as to the limitation of Plaintiff's damages

to the terms of the British Airways's Airways Bill for the goods at issue, but are **DENIED** as to the

applicability of the Montreal Convention.

It is so **ORDERED**.

**ENTERED** this the _18th_ day of June, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court